## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| TARA M. HOMBURG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 05-2144-KHV |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

### MEMORANDUM AND ORDER

Tara Homburg has filed suit against United Parcel Service, Inc. under Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e et seq., claiming that it discriminated against her based on

gender, and retaliated for her exercise of rights under the Family and Medical Leave Act, 29 U.S.C. §

2601 et seq. ("FMLA"), and her complaint of gender discrimination. The matter is before the Court on

Defendant United Parcel Service Inc.'s Motion For Summary Judgment (Doc. #57) filed March 31, 2006.

For reasons stated below, the Court finds that defendant's motion should be sustained in part and overruled

in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); accord Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th

Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing

law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of

evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment.  See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  See Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## **Factual Background**

The following facts are either undisputed or, where disputed, construed in the light most favorable

to plaintiff.

United Parcel Service, Inc. ("UPS") employed plaintiff for six years, from August of 1998 to June 1, 2004. Plaintiff initially worked as an Area Sales Manager in the Kansas district. In this position, she worked from home on occasion and at times did not inform her supervisor where she was.[1] Tim Gombac, plaintiff's supervisor, knew that she worked from home and was not concerned that she was not spending enough time in the office.

In May of 2003, Sean O'Shaughnessy, Vice President of Sales and Marketing for the UPS West Region, approached Gombac to inquire whether plaintiff would be interested in a position as the Regional Sales Training Manager ("RSTM") for the West Region. The West Region included 16 states, and the RSTM position had been vacant for two years. O'Shaughnessy sought plaintiff based on comments and observations of her and because she was highly skilled in coaching and working with people.

On May 11, 2003, plaintiff learned that she was pregnant. On May 12, 2003, Gombac spoke with plaintiff about the RSTM position. The next day, during a conversation about the position, plaintiff told Gombac that she was pregnant. Plaintiff was reluctant to take the position; she did not want a job which required a lot of travel while she had a newborn.[2] In response to questions, Gombac told plaintiff that "there is nothing that I know that makes me think you have to travel a lot," Gombac Dep. 69:7-11, Dec. 22, 2005, and said that the job required limited travel such as an occasional trip to Atlanta for training. Gombac also told plaintiff that her pregnancy should not be a problem. In June of 2003, plaintiff met with O'Shaughnessy. During this meeting, plaintiff told him that she was pregnant and that she would not be able

---

[1]      Nothing in the record indicates how frequently plaintiff worked from home.

[2]      Plaintiff also had reservations about taking a non-commission job with a lower base pay.

to travel much, especially after the birth, because she planned to breast-feed.  O'Shaughnessy stated, "that shouldn't be a problem.  We will work around it."  Homburg Dep. 67:3-4, Nov. 30, 2005.  Effective July 1, 2003, defendant hired plaintiff as RSTM for the West Region.  O'Shaughnessy selected plaintiff over three male candidates.  Based on assurances regarding travel and pay, plaintiff accepted the position. O'Shaughnessy initially supervised plaintiff in her new position, and he assigned her responsibilities.

On May 27, 2003, Gombac recommended that as RSTM, plaintiff receive a monthly salary of $5,750 to $5,800, which was a higher monthly salary than she would have received under company guidelines.  Gombac made this recommendation because plaintiff was moving from a commissioned position to a non-commissioned position and under company guidelines, this lateral move would have decreased her salary.[3]  On August 13, 2003, O'Shaughnessy recommended that defendant increase plaintiff's salary to $6,000 per month, which approximated her salary in her previous position.  Mike Kamienski, West Region Manager, agreed to the increase.

During this time, plaintiff asked to work on projects at home and O'Shaughnessy told her, "that would be fine, just let me know."  During September, October and November of 2003, plaintiff worked from home and from the office.  Plaintiff believed that it was common knowledge that she worked from home, and she did not ask permission to do so.  Plaintiff worked from home because she was more productive, not because she was pregnant.[4]  O'Shaughnessy testified that plaintiff worked from home when she was not feeling well enough to come in to the office and that he believed she worked from home about

---

[3]        As Area Sales Manager, plaintiff had earned about $6,900 per month with commissions.

[4]        Plaintiff notes that she did not experience morning sickness or nausea during her pregnancy and that except for a couple of occasions where her chair at work was hard on her back, she did not stay at home due to pregnancy.

half a dozen times.  O'Shaughnessy never criticized plaintiff for working from home.  Plaintiff worked from home more frequently between July and December of 2003 than she worked from home after she returned to work from maternity and FMLA leave on March 29, 2004.[5]

Plaintiff completed a budget for 2004 which contemplated limited travel.  O'Shaughnessy approved the budget.  In October of 2003, plaintiff attended a training session in Atlanta, Georgia.  Before she took maternity leave, plaintiff had traveled to Minnesota, Colorado, Missouri and Kansas, and for the months of June, July and August of 2004, she had scheduled travel to Nebraska, Missouri, Kansas, the Rocky Mountain District and Oregon.  O'Shaughnessy never spoke to plaintiff about her lack of travel.

As her delivery date approached, plaintiff spoke with Dan Shipley, human resource representative, about maternity leave.  Shipley remarked, "So, you are going to have a pup."  Shipley told plaintiff that her maternity leave would start when her water broke.  Defendant allows six weeks for maternity leave.

On December 31, 2003, plaintiff gave birth.  Plaintiff combined maternity leave and FMLA leave from January 1 through March 29, 2004.[6]  Plaintiff was reluctant to take maternity leave because Gombac previously had commented that an account executive who had taken 12 weeks of leave must not have

---

[5]       The record does not indicate the specific number of days plaintiff worked from home.

[6]       On February 18, 2004, while plaintiff was on leave, she e-mailed two other RSTMs, Linus Butkunas and Dave Carpenter, asking whether they worked from a home office.  Carpenter stated that he no longer worked as an RSTM and that he worked "from an office on days when in my home city.  I have the option of working some from my home but I'm fortunate to have a great office setup and I prefer that." Exhibit 23 to Plaintiff's Opposition (Doc. #61).  Butkunas replied, "Office every day."  Exhibit X to Defendant's Memorandum (Doc. #58).  Plaintiff testified that at a regional sales training manager meeting in October of 2004, "[t]here was some discussion around us and it is also pretty common knowledge that in business development, people are allowed to work from home."  Homburg Dep. 148:6-9.

wanted a promotion very badly or she would not have taken that much time.[7]  Plaintiff testified that colleague Angela Watson "was just shocked that I was taking all 12 weeks and she informed me that she didn't take the full 12 weeks, that she took the six weeks and came back to work."  Homburg Dep. 211:10-13.

On February 1, 2004, while plaintiff was on maternity leave, Tom Volta transferred into the West Region and became Human Resources Manager.  On March 1, 2004, Richard "Rusty" Tebo replaced O'Shaughnessy as Vice President of Sales for the West Region and became plaintiff's supervisor.  Four weeks later, on March 29, 2004, plaintiff returned to work.  Within a week of her return, plaintiff asked Tebo whether she could work at home on occasion.  Tebo told plaintiff that she could, as long as the work was getting done.  Plaintiff worked from home for two weeks after returning from FMLA leave, until April 12, 2004.  Exhibit 29 to Plaintiff Tara Homburg's Memorandum In Opposition To Defendant UPS' Motion For Summary Judgment ("Plaintiff's Opposition") (Doc. #61) filed April 24, 2006.

During the prior week which ended on April 10, 2004, while plaintiff was working at home, Tebo received a complaint from an employee that "it had gotten around that I had approved that Tara could work from home and there was some real issues with consistency amongst the other employees in the office."  Tebo Dep. 131:20-24.  On April 12, 2004, Tebo met with plaintiff.  At that meeting, Tebo told plaintiff that she could no longer work from home because "then everyone would want to work from home."  Exhibit 13 to Plaintiff's Opposition (Doc. #61).  Plaintiff complained to Tebo that his position was

---

[7]      Plaintiff notes other experience "with a more general, sexist culture" at UPS.  Specifically, plaintiff claims that at golf tournaments in 2000 and 2001, defendant assigned her to drive a beer cart and directed her to wear the brown UPS uniform with shorts.  Plaintiff notes that males were never assigned this duty.

discriminatory and that men were allowed to work from home.  Plaintiff continued to work from home on

occasion.[8]

On April 29, 2004, plaintiff met with Volta, who told her that she would not be allowed to work

from home.  Plaintiff complained that men were allowed to work from home, which Volta construed as a

complaint of gender discrimination.  At 7:30 a.m. on May 4, 2004, plaintiff met with Tebo.  During that

meeting, Tebo told plaintiff that she needed to work in the office five days a week.  Plaintiff told Tebo, "quit

insisting on me coming into the office and to allow me to do my work."  Immediately after the meeting,

plaintiff left the office to work from home.  Tebo told plaintiff that defendant could terminate her

employment if she did not come into the office to work.  Plaintiff asked Tebo not to retaliate against her for

stating that she had been discriminated against.  That same day, Tebo sent plaintiff a letter which stated as

follows:

> I am concerned that you have not reported to work this week.  On April 29, 2004
> you had a discussion with the Region Human Resources Manager Tom Volta requesting
> to work from home.  Tom informed you that this would not be an option and instructed you
> to report to work at the region office.  You also approached me with your request, and
> were again instructed to report to work at the region office.
>
> One of the essential functions of your job is to work out of the designated office
> location to which you are assigned.  You have not reported to this location on Monday,
> May 3 nor Tuesday, May 4.  Your failure to report to work indicates that you are unwilling
> to meet the job requirements and have abandoned your position.
>
> Tara, it is imperative that you report to work at your office location no later than
> May 6, 2004.  If you have not reported by this date I will have no alternative, but to

---

[8]     In her complaint, plaintiff stated that she continued to work from home until she could meet
with Human Resources.  Complaint (Doc. #1) filed April 13, 2005 at ¶ 18.  Plaintiff met with Volta on
April 29, 2004.  Plaintiff testified, however, that she worked from home "some" during this time period and
that some days she did not come into the office at all.

assume you are no longer interested in employment with UPS and your employment will
be terminated.

Exhibit R to Defendant United Parcel Service Inc.'s Memorandum In Support Of Its Motion For Summary
Judgment ("Defendant's Memorandum") (Doc. #58) filed March 31, 2006.  On May 5, 2004, plaintiff
talked with Jerry Frasso at Corporate Human Relations.  She told Frasso that male RSTMs were allowed
to work from home and that she was being discriminated against because she was a female with a small
child.  Plaintiff also told Frasso that she was willing to work with Tebo and go into the office when he
needed to meet with her, review reports, work on projects that could not be completed at home, or for
meetings.  Frasso encouraged plaintiff to discuss the matter with Volta and Tebo.

On May 6, 2004, plaintiff met with Volta.  Plaintiff summarized the meeting in a memo, which stated
in part:

> I met with Tom Volta around 10:30 am to discuss my concern of other men being
> allowed to work from home. . . . Tom was very upset that I had contacted Corporate with
> my issue. . . .
> Tom indicated there are not any employees in the West Region working from
> home.  He stated the only people working from home may do so only on occasion if
> traveling is involved.  Furthermore, he said there are business necessity cases in UPS that
> do allow an individual to work from home due to lack of office space.  However, there are
> none of these jobs in the West Region.  Tom was unable to tell me who these business
> necessity cases are because they are in other regions. . . .  I explained to Tom I felt I was
> being discriminated against because I was Female and have a young child at home.  I told
> Tom that Wes Williams the Region Sales Training Manager out of PA is allowed to work
> from his home.
> * * *
> Tom said I would not be able to work from home.  That I must start reporting to
> the office or I will be terminated.

Exhibit 30 to Plaintiff's Opposition (Doc. #61).  Volta testified that he was upset that plaintiff had gone over
his head and that complaint to Frasso was inappropriate.  Plaintiff told Volta that she was willing to go into

the office when Tebo needed her there or when projects required her to be in the office.  About an hour

later, plaintiff had a second meeting with Volta and Mike Kamienski, the West Region Manager.  Plaintiff

told them that breast feeding would be easier if she could work from home.  Kamienski told plaintiff that

she should be traveling more.  Plaintiff summarized the meeting in a memo, which stated in part:

> My take away from the meeting is that Mike and Tom are willing to make an undefined
> accommodation for a limited amount of time while I am breastfeeding.  I voiced my
> concerns about other males working from home, about my ability to do my job from home
> prior to FLMA.  We agreed I would think about it and get back to them on Friday,
> May 7th.  Until this issue is resolved I am being required to come into the office in the
> morning.  When I asked if I could do some of my work from home Mike indicated I
> should report to the office in the morning and "use good judgment" the rest of the time.  I
> also shared with them my concerns of diminished effectiveness by having to come into the
> office for half a day because of the drive time in the middle of the workday.  Mike
> indicated he is willing to accept this reduction in effectiveness. Most of my concerns during
> the meeting that were unrelated to breastfeeding were met with "you cannot come in here
> and demand to be able to work from home" or other strong resistance to compromise.
> I explained I am not asking to work from home five days a week but instead I am asking
> for the flexibility to be able to work from home when my job permits it.

Exhibit 29 to Plaintiff's Opposition (Doc. #61).

Around May 6, 2004, an unidentified office manager told Volta that there may have been a

question whether plaintiff was inappropriately compensated for her maternity leave or FMLA leave.  Volta

instructed another employee to research whether the proper amount of time had been taken and whether

there were any payroll issues.  Volta determined that "it was all within the scope and properly done."  Volta

Dep. at 117: 4-118:18.

On May 27, 2004, plaintiff met with Volta and Gary Libertim, region employee relations manager.

During this meeting, plaintiff again asked to be able to work from home on occasion, and Volta denied her

request.  Plaintiff stated, "that's what I think is discrimination because I'm female and I have a small baby."

Exhibit 34 to <u>Plaintiff's Opposition</u> (Doc. #61). Plaintiff told Volta that she would continue to work from home on occasion when her job allowed. Volta responded that plaintiff would lose her job if she was directed to do something and chose not to do it. Volta also told plaintiff that she would need to travel.

On May 28, 2004, Tebo called plaintiff and directed her to report to work or her employment could be in jeopardy.

During the month of May, plaintiff did not report to work on May 3, 5, 25, 26 or 28. Plaintiff reported to work at the office for portions of the day on May 4, 6, 7, 10, 11, 12, 13, 14, 17, 18, 19, 20, 21, 24 and 27, 2004.

On June 1, 2004, Tebo and Volta met with plaintiff and discharged her from employment. Defendant claims that it terminated plaintiff's employment because she did not report for work as directed, and not because of poor job performance. Tebo and Volta made the decision to terminate plaintiff's employment. Tebo had no complaints about plaintiff's performance, and Volta was not aware of any complaints about plaintiff's work.

Plaintiff applied for unemployment benefits. Defendant contested her application. The Kansas Department of Labor determined that plaintiff was qualified for benefits.

Defendant does allow some employees to work from home. Defendant refers to these employees as "virtual" employees. Typically, virtual employees have no designated office; they generally work for e-commerce accounts or national accounts where they service a large account on a national level. Employees who report to an office are referred to as "geo" employees. Defendant considered plaintiff a geo employee.

Defendant does not have a policy whether RSTM employees must report to the office on a daily basis. Plaintiff's job description did not expressly require her to report to the office. In response to

-10-

interrogatories, plaintiff identified 61 males (positions unknown) who allegedly worked from home. None of these individuals, however, were RSTMs under the supervision of Tebo.[9]  In plaintiff's office, the following employees worked from home: (1) employees supervised by Lisa Yount, Kansas Sales Manager; (2) Jerry Olsen, Director of Sales (segment director for national sales); (3) Rick Campbell, Solutions Development; and (4) Bill Lundquist, Solutions Manager.  In other UPS offices, the following employees worked from home:  Dave Carpenter (Sales Training group in the North Central Region); five National Accounts Managers, three male, one female and one unknown (Terry Laseter, Pat Day, Kim Karbum, Stacy Nichols and Ria Karnavas; two National Training Managers, one male and one female (Ken Seidl and Melissa Ortuno); and  Brian Gormley (Sales Planning & Performance Coordinator).  None of these individuals worked as RSTMs or reported to Tebo.

On June 8, 2004, Kelly Shillito, Corporate Human Resources, e-mailed the following message to Region HR Managers:

> The Corporate office has recently been inquiring about employees in the districts and regions who are allowed to telecommute.  We have limited our scope at this point to National Accounts, E-Commerce and Professional Services.  We have found out that we do have a significant amount of people who are telecommuting for various business related reasons such as lack of office space in districts and regions, travel time to accounts is closer from home than office, etc.  One of the problems we are uncovering is that it is clear there is no approval process and there aren't any consistent guidelines for the employees to follow.  As you all know, this group of employees that we have been gathering information on are all part of the "virtual districts" and thus roll-up to Corporate.  So, we will be putting together the guidelines very soon here.
>
> One immediate item though that I need all of your help with is in the area of Region Sales Training managers.  I need you all to do a quick check to see if any of these employees have been telecommuting (even partially, 1 or 2 days a week) and if so, I will

_____

[9]     The record does not indicate which of these individuals worked as RSTMs.  Plaintiff is the only RSTM under Tebo's supervision.

need to know their name, how often they are telecommuting and why they are allowed to telecommute.  Please do not have someone ask them directly, nor should you forward this e-mail to anyone.  It would be best if you would just ask your BD counterpart.  I appreciate if you could please get back with me by Thursday, June 10 with this information.

Exhibit 46 to Plaintiff's Opposition (Doc. #61).

After she returned from maternity and FMLA leave, plaintiff did not travel for work outside of the Kansas City area.  When she worked from home after the birth, her husband watched the baby, took the baby to work with him and brought the baby home for feedings.  Plaintiff anticipated that when she traveled for work, her husband would travel with her to care for the baby.  When plaintiff worked at the office, her husband took the baby to the UPS office for feedings.

Other women at UPS have taken maternity leave and continue to be employed at UPS.  Defendant replaced plaintiff with another female who had no small children at home.

On July 27, 2004, plaintiff filed charges of sex discrimination with the Equal Employment Opportunity Commission ("EEOC").  On January 25, 2005, she received a notice of right to sue.  On April 13, 2005, plaintiff filed a complaint which alleges that defendant discriminated against her by changing job requirements and terminating her employment, and retaliated for her exercise of rights under the FMLA and because she complained of gender discrimination.

Defendant argues that it is entitled to summary judgment because (1) plaintiff's claim under the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e-2(a)(1), does not state a cognizable claim since she was not pregnant when the alleged discrimination occurred; (2) plaintiff cannot establish a prima facie case of gender discrimination; (3) it had a legitimate, nondiscriminatory reason for terminating plaintiff's employment and plaintiff cannot show that it was pretextual; (4) plaintiff cannot establish a prima

-12-

facie case of retaliation; and (5) on the retaliation claims, plaintiff cannot show that its legitimate, nondiscriminatory reason for termination was pretextual.

### Analysis

### I.       Discrimination Claims

Title VII makes it unlawful to discriminate against any individual with respect to terms, conditions, or privileges of employment based on the employee's sex.  See 42 U.S.C. § 2000e-2(a)(1).   The Pregnancy Discrimination Act ("PDA") amended Title VII in 1978 to bring the condition of pregnancy within the definition of sex discrimination.  See E.E.O.C. v. Ackerman, Hood & McQueen, Inc., 956 F.2d 944, 947 (10th Cir. 1992) (PDA added to Title VII to prevent the differential treatment of women in all aspects of employment based on condition of pregnancy) (quoting Carney v. Martin Luther Home, Inc., 824 F.2d 643, 646 (8th Cir. 1987)).  Defendant argues that it is entitled to summary judgment on plaintiff's discrimination claim under the PDA because her claim is based on her status as a new mother, which is not cognizable and therefore fails to state a claim.  In the pretrial order, plaintiff alleges that she told Tebo that "she felt she was being discriminated against because of her gender and because she had just had a baby, since males in the company were allowed to work from home."  Doc. #56 at 6.   At the status conference on July 25, 2006, plaintiff clarified that she does not assert a discrimination claim based on pregnancy.  Her claim is that "her status as a woman made all the difference" and that "men were treated differently than she was."  Plaintiff's Opposition (Doc. #61) at 36, 41.  The Court therefore analyzes plaintiff's claims as claims of discrimination based on gender and overrules as moot defendant's motion for summary judgment under the PDA.

### A.   Prima Facie Case

Defendant argues that plaintiff cannot set forth a prima facie case of sex discrimination because she cannot show that she suffered adverse employment action under circumstances which give rise to an inference of discrimination.  Plaintiff contends that she experienced multiple adverse employment actions: (1) a requirement that she work from the office on a daily basis; (2) increased requirement to travel; and (3) termination of employment.  Plaintiff also contends that she can establish the fourth element of a prima facie case because her job was not eliminated after defendant terminated her employment.

#### 1.   Adverse Employment Actions

To establish adverse employment action, plaintiff must experience "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  The Tenth Circuit liberally defines adverse employment action.  Hill v. Steven Motors, Inc., 97 F. App'x 267, 278 (10th Cir. 2004); Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998).  Such actions are not simply limited to monetary losses in the form of wages or benefits. Id.  The Tenth Circuit applies a "case-by-case" approach, examining the unique factors relevant to the situation before it.  See Hill, 97 F. App'x at 278; Sanchez, 164 F.3d at 532.  Nevertheless, adverse employment action does not include "a mere inconvenience or an alteration of job responsibilities."  Id. (citations and quotations omitted).

Without citing case law, plaintiff first asserts that defendant's refusal to let her work from home and insistence that she do more travel constitute adverse employment actions.  Defendant disagrees, arguing that in more than one case, the Tenth Circuit has held that a job transfer which requires additional

commuting time is not an adverse employment action. Here, plaintiff's job was not transferred, and neither party cites case law which addresses whether withdrawal of permission to work from home constitutes an adverse employment action. Although the Tenth Circuit has not addressed this question, district courts in other jurisdictions have consistently held that the denial of a request to work from home is not adverse employment action. For example, in <u>Daniels v. Federal Reserve Bank of Chicago</u>, No. 98 C 1186, 2006 WL 861969, at *12 (N.D. Ill. Mar. 31, 2006), the Northern District of Illinois concluded that a denial of plaintiff's request to work from home while she recovered from surgery was not an adverse employment action. <u>See also</u> <u>Ashton v. AT&T Corp.</u>, No. Civ.A.03-CV3158(DMC), 2005 WL 2320899, at *6 (D.N.J. Sept. 22, 2005) (denial of request to work from home not significant change in employment); <u>Smith v. AVSC Int'l, Inc.</u>, 148 F. Supp.2d 302 (S.D.N.Y. 2001) (new supervisor's refusal to let plaintiff work from home not adverse employment action under state human rights law); <u>Sabrah v. Lucent Techs., Inc.</u>, No. Civ.A.3:96-CV-2827-D, 1998 WL 792503 (N.D. Tex. Nov. 6, 1998) (denial of opportunity to work at home not ultimate employment decision). In <u>Sanchez</u>, the Tenth Circuit concluded that an involuntary transfer which increased commuting time but did not alter pay, benefits and job responsibilities was not adverse employment action. 164 F.3d at 532. The Tenth Circuit has also found that requiring plaintiff to travel was not a significant change which amounted to adverse employment action. <u>Hill</u>, 97 F. App'x at 279.

Plaintiff relies on <u>Reed v. Unified School District No. 233</u>, 299 F. Supp.2d 1215 (D. Kan. 2004), for the proposition that a change in job responsibilities constitutes adverse employment action. The Court easily distinguishes <u>Reed</u>, however, because defendant in that case stripped plaintiff of all meaningful responsibilities. Here, plaintiff's job duties did not change; defendant merely required plaintiff to perform

them at the office rather than at home.  Plaintiff's salary and benefits remained the same.  The Court therefore finds that defendant's requirements that plaintiff travel more and work from the office did not constitute adverse employment action.  As a matter of law, defendant is entitled to summary judgment on plaintiff's claims of gender discrimination based on these particular actions.

Defendant's termination of plaintiff's employment clearly constitutes adverse employment action. The Court continues its analysis of plaintiff's prima facie case based solely on that facet of plaintiff's claim.

### 2.        Circumstances Which Give Rise To Inference Of Discrimination

Defendant argues that plaintiff cannot show that (1) it treated similarly situated employees more favorably or (2) it discharged plaintiff based on gender.  Plaintiff argues that to establish a prima facie case, she need only show that defendant did not eliminate her position after it terminated her employment.

The Tenth Circuit has stated that "proof that a qualified individual in a protected class was discharged and that his position remained open after the discharge raises an inference of discrimination because it eliminates the two most common legitimate justifications for discharge – lack of qualification and elimination of a position."  Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181-82 (10th Cir. 2002).  Here, plaintiff has shown that she was qualified for her position and that the position remained after termination.  Plaintiff has set forth a prima facie case of gender discrimination.  See Reed, 299 F. Supp.2d at 1227 (citing Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999)).

### B.        Legitimate, Nondiscriminatory Reason For Termination Of Employment

Defendant asserts that it had a legitimate, nondiscriminatory reason for terminating plaintiff's employment, i.e. because she refused to work in the office as directed by her supervisor.  Failure to follow directives of a supervisor constitutes a legitimate nondiscriminatory reason for termination of employment.

See, e.g., Montes v. Vail Clinic, Inc., No. 01-CV-1250-RPM-CBS, 2005 WL 1528707, at *7 (D. Colo. June 29, 2005) (failure to follow supervisor's request is legitimate, nondiscriminatory reason for discharge).

### C.   Pretext

Where defendant articulates a facially legitimate reason, the burden shifts back to plaintiff to present evidence that defendant's proffered reason is pretextual, that is, "unworthy of belief."  See Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1120 (10th Cir. 2001).  Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).  Plaintiff can further show pretext with evidence that (1) defendant's stated reason for the adverse action was false; or (2) defendant acted contrary to its policy or practice when making the adverse decision.  See Kendrick v. Penske Transp., Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  Evidence of pretext may also be shown by disturbing procedural irregularities.  See Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002).

Defendant argues that plaintiff has no evidence that the stated reasons for termination were pretextual.  Plaintiff contends that she can show pretext through (1) inconsistent enforcement of defendant's policy regarding travel and work from home; (2) shifting focus and explanations for the termination of her employment; and (3) the overall culture at UPS.

As evidence of pretext, plaintiff first asserts that defendant enforced a non-existent policy which required her to travel more and work from the office.  Plaintiff argues that defendant did not have a policy which addressed working from home, and that Tebo and Volta enforced a policy for the Leawood office

which was specific to her, while defendant permitted males to work from home. Plaintiff, however, omits critical information, including the fact that none of the identified males worked as RSTMs. In fact, plaintiff cites no evidence that Tebo permitted any employee to work from home, or that any RSTM received greater latitude to work from home than she did.

As further evidence of pretext, plaintiff cites the fact that defendant allowed her to work from home before she took leave but not after. During that time, however, she obtained a new supervisor. Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important. Rojas v. Florida, 285 F. 3d 1339, 1343 (11th Cir. 2002). Here, the record reflects that when she returned from leave, plaintiff sought permission to occasionally work from home. She then worked from home for two straight weeks, until Tebo received a complaint. Tebo then rescinded his permission and told plaintiff to report to the office on a daily basis. Such a change does not constitute an "inconsistency" in the reasons for terminating plaintiff's employment, and is not evidence of pretext.

Plaintiff next argues that defendant gave shifting reasons for terminating her employment. The Court disagrees. Defendant has consistently stated that it terminated plaintiff's employment because she refused to follow her supervisor's directive to work from the office. Plaintiff focuses on the fact that defendant insisted that she travel more, but the record does not reflect that her lack of travel caused defendant to terminate her employment, or that defendant ever notified plaintiff that it would terminate her employment if she did not travel more.

Plaintiff contends that the evidence does not support the stated reason for termination. Specifically, plaintiff claims that she did not refuse to work from the office, but simply wanted to work from home "from

time to time." The evidence, however, clearly contradicts plaintiff's position. On May 6, 2004, Volta told plaintiff that she must start reporting to the office or face termination of employment. On May 7, 2004, Volta told plaintiff that until the issues were resolved, she must at least report to the office in the morning. On May 25 and 26, 2004, plaintiff did not report to work at the office. On May 27, Volta again denied plaintiff's request to work from home on occasion, and on May 28, plaintiff did not report to the office. That same day, Tebo contacted plaintiff and directed her to report to the office; she did not do so. On June 1, 2004, defendant terminated plaintiff's employment. Plaintiff openly disregarded clear and direct instructions from her supervisor, and her conduct is totally inconsistent with her argument that she did not refuse to work from the office.

Finally, plaintiff argues that the overall culture at UPS is evidence of pretext. Plaintiff cites the following incidences: (1) her own reservations about taking maternity leave; (2) the fact that Gombac criticized another woman for taking maternity leave; (3) the shock of "others" that plaintiff was planning to take leave; (4) Shipley's statements that plaintiff was "going to have a pup" and that she would not start her maternity leave "until her water broke;" (5) O'Shaughnessy's stereotyped perceptions that plaintiff worked from home because she had morning sickness and that she might not want to return from maternity leave; and (6) defendant's request that plaintiff wear a UPS driver's uniform, including shorts, to drive a beer cart at two company golf tournaments. Taken as a whole, these incidences do not create a genuine issue of material fact as to pretext. Plaintiff has cited no evidence that any other RSTM received more lenient accommodations from defendant with respect to working from home. When plaintiff returned from maternity leave on March 29, 2004, she sought and received permission to "occasionally" work from home. Instead of doing so "occasionally," plaintiff worked from home for two solid weeks. In response

to complaints from another employee, and to more consistently enforce defendant's policy on working from home, Tebo then directed plaintiff that she could no longer work entirely from home. While plaintiff was breast-feeding, until the issue was resolved, Tebo agreed that plaintiff could go to the office in the mornings and "use good judgment" the rest of the time. Throughout the entire period from March 29, when she returned from maternity leave, until June 1, when defendant fired her, plaintiff abused Tebo's permission to "occasionally" work from home, continued to work from home, selectively refused to go to the office, demanded that her supervisor "quit insisting on [her] going to the office," and basically made clear by words and by conduct that no matter what Tebo said, she was working a flexible schedule and that did not involve reporting to the office on a daily basis. The record contains no evidence that Tebo enforced an office attendance policy on a discriminatory basis as to sex, or that defendant allowed males in plaintiff's position the flexible schedule which she demanded. On this record, no reasonable jury would conclude that defendant terminated plaintiff's employment on account of her sex. Plaintiff has not demonstrated a genuine issue of material fact whether defendant's stated reason for termination is pretextual. Defendant is entitled to summary judgment on this claim.

## II.   Retaliation

### A.      Retaliation For Complaints Of Discrimination

To establish a prima facie case of retaliation under Title VII, plaintiff must demonstrate that (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. Miller v. Auto. Club of N.M., 420 F.3d 1098, 1119 (10th Cir. 2005). Once the prima facie case is established, "the burden shifts to the employer to offer a facially legitimate rationale for the adverse action. The burden

then shifts back to the plaintiff to show the employer's explanation is pretext." Id. at 1120.

If plaintiff establishes adverse employment action, she must prove a causal connection between the adverse employment action and her invocation of rights under Title VII. Plaintiff may establish a causal connection with evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct followed closely by adverse action. Morgan, 108 F.3d at 1325 (plaintiff must show adverse employment action motivated by impermissible retaliatory or discriminatory animus).

Defendant does not dispute that plaintiff engaged in protected opposition to perceived discrimination. Defendant argues that plaintiff cannot establish a prima facie case because (1) she did not suffer adverse employment action, and (2) she cannot show a causal connection between the complaint of discrimination and termination of her employment. The Court adopts its earlier analysis whether defendant's actions constitute an adverse employment action, and finds that plaintiff suffered an adverse employment action when defendant terminated her employment.

Defendant argues that plaintiff cannot show a causal connection between her complaints of discrimination and the termination of her employment. Specifically, defendant contends that the termination merely concluded a process set in motion before plaintiff's protected activity. Plaintiff responds that termination of her employment was not a foregone conclusion or merely a culmination of a process already set in motion. Plaintiff argues that on May 5, 2004, she spoke with Frasso in Corporate Human Relations, who told her to speak with Tebo and Volta about how her job might be performed from home. The next day, Kamienski told her to speak with Tebo about possible accommodations. Defendant terminated plaintiff's employment before she had the opportunity to speak further with Tebo. Plaintiff concludes that the termination of her employment before this conversation took place is evidence of a causal connection

-21-

between her protected activity and the termination of her employment.

Defendant also argues that plaintiff cannot rely on temporal proximity to establish a sufficient causal connection because too much time had passed between the activity and termination. A causal connection may be demonstrated by evidence such as protected conduct closely followed by adverse action. See Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997). A two-month time period between protected activity and an adverse employment action may be sufficient to demonstrate causation. See Annett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004); Ramirez v. Okla. Dep't of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994) (one and one-half month period sufficient to establish causation). Defendant cites Richmond v. ONEOK, Inc., 120 F.F.3d 205, 209 (10th Cir. 1997), for the proposition that three months between protected activity and adverse employment action is too remote to establish causation, and Kendrick, 1999 WL 450886, at *8, for the proposition that two months between protected activity and termination is insufficient to establish causation.

Here, plaintiff made her first complaint of discrimination some seven weeks before defendant terminated her employment. In addition, whenever defendant communicated its requirement that she work from the office at least part of every day, plaintiff reiterated her complaint of sex discrimination. In Kendrick, plaintiff's *last* complaint of discrimination occurred more than two months before termination and the decision-maker had no knowledge of plaintiff's complaints. That is not the case here. Plaintiff first complained of discrimination on April 12, 2004. She made additional complaints on May 4, 5, 6 and 27, 2004. Her last complaint of discrimination occurred just days before defendant terminated her employment. Furthermore, plaintiff made these complaints to the very individuals who decided to terminate her employment. The temporal proximity is sufficient to establish a prima facie case of retaliation.

Defendant next argues that plaintiff cannot show that its legitimate, non-retaliatory reason for terminating her employment is pretextual. Plaintiff responds that despite evidence that she performed her job well, defendant began looking for reasons to terminate her employment after she complained of discrimination. Plaintiff points to Volta's angry reaction to the news that she had complained of discrimination to Corporate Human Relations and, that same day, Volta's investigation into whether she had appropriately taken FMLA leave. Given these additional facts plus the close temporal proximity between plaintiff's complaints of discrimination and the termination of her employment, a reasonable jury could find that defendant's stated reason was pretextual. A reasonable jury could also find that plaintiff was a bold and savvy manipulator who invoked baseless complaints of sex discrimination in an effort to negotiate a more accommodating work schedule, and neutralize any effort by Tebo – her new supervisor – to require that she report to the office. In the context of this motion, however, the Court must give plaintiff the benefit of all favorable inferences. Defendant is not entitled to summary judgment on this claim.

**B.     Retaliation For FMLA Leave**

To establish a prima facie case of FMLA retaliation, plaintiff must show (1) that she availed herself of a protected right under the FMLA; (2) that defendant took adverse employment action against her; and (3) a causal connection between these two actions. Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1104 (10th Cir. 2005). Under the FMLA, an adverse employment action occurs when an employer uses the taking of FMLA leave as a negative factor in employment actions such as hiring, promotions or disciplinary actions.

As previously stated, the termination of plaintiff's employment is an adverse employment action. The temporal proximity between plaintiff's return from FMLA leave and the termination of her employment

-23-

is sufficient to establish a prima facie case of retaliation for FMLA leave.

Plaintiff argues that defendant's attitude toward maternity leave and FMLA leave is sufficient to show pretext. While plaintiff's conclusory statements about defendant's attitude is not sufficient to show pretext, Volta's sudden investigation of plaintiff's FMLA leave, when paired with temporal proximity, provides evidence that defendant's reason for terminating her employment was pretextual. Defendant is not entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that Defendant United Parcel Service Inc.'s Motion For Summary Judgment (Doc. #57) filed March 31, 2006 be and hereby is **SUSTAINED in part** and **DENIED in part**. Defendant is granted summary judgment on plaintiff's discrimination claims. Plaintiff's retaliation claims remain for trial.

Dated this 27th day of July, 2006, at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge